THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BENJAMIN JAMES GIBSON, Defendant-Appellant.

Fourth District   No. 17604

Opinion filed September 14, 1982.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas L. Brownfield, State's Attorney, of Havana (Robert J. Biderman and Garry W. Bryan, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WEBBER delivered the opinion of the court:

Defendant was charged with five counts of murder in violation of sections 9—1(a)(1) and 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (2)). A jury in the circuit court of Mason County returned a general verdict of guilty, and after denying post-trial motions, the court sentenced defendant to 25 years' imprisonment.

On appeal, no question of reasonable doubt has been raised and therefore no extended recitation of the evidence presented at trial is required for the purposes of this opinion. Suffice it to say that we have read the record and find the verdict amply justified. Some of the evidence produced at trial and at the pretrial hearings will be reproduced in order that the issues raised may be better understood.

Defendant's first, and in our opinion most significant, issue concerns the validity of the amended indictment under which he was tried. The original was handed up by a grand jury attending upon the circuit court of Tazewell County and alleged that the offense had occurred in that county. Later, the amended indictment was handed up by the Tazewell County grand jury and it alleged that the offense had occurred in Mason County. Defendant filed a motion to quash the indictment and a motion to dismiss. The court in Tazewell County heard the motion to dismiss and found it to be without merit insofar as it alleged lack of jurisdiction; the court did find that the motion has merit insofar as it alleged an improper place of trial; and under the provisions of section 114—1(f) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 114—1(f)) transferred the entire cause to Mason County. The Tazewell court declined to rule upon the

motion to quash. An amended motion to quash was filed by defendant in the circuit court of Mason County and alleged in substance that the grand jury sitting in Tazewell County had exceeded its "jurisdiction" in handing up an indictment which stated the place of the offense to be in Mason County. The trial court denied the motion, holding that section 114—1(f) was controlling.

The record before us does not contain the report of the grand jury proceedings on either the original or the amended indictment, although colloquy in the record indicates that the reports had been furnished to defendant by way of discovery. We can therefore only attempt to reconstruct from testimony given at the hearings on the motion to suppress evidence and on the motion for arrest warrant what was probably presented to the grand jury.

On March 30, 1981, the State's Attorney of Tazewell County appeared before a judge of that county with an information charging defendant with the offense of murder; he asked leave to file the information and to present evidence in support of an arrest warrant. Leave was granted and a special agent from the Illinois Division of Criminal Investigation testified. He stated that for several months he had been investigating the disappearance of Stephen Butler and that the body of Butler had been discovered on a rural farm in Tazewell County; further, that other persons had stated that Butler and defendant were associates and had been in the Pekin area during December 1980. Other witnesses stated to the officer that defendant had confessed to them that he had killed Butler during the time that they were in the Pekin area. An individual whose name was Bow Payne, who was wanted for armed robbery in Tazewell County, had been apprehended in Houston, Texas. The officer testified that he had gone to Houston to return Payne to Illinois, and that Payne had advised him that he had assisted defendant in dumping the body of Butler into a cesspool at the farm in Tazewell County.

The court ordered the arrest warrant to issue and it was forwarded to the authorities at Reno, Nevada, where defendant purportedly was staying at the time. The Reno police apprehended defendant on March 31, 1981, on the Illinois warrant and placed him in a cell with an informant. According to the informant's testimony at a hearing on a motion to suppress, defendant expressed surprise that Tazewell County authorities were involved since, according to defendant, the killing took place in Mason County in a State forest about four miles from defendant's home, after which he took the body to a farm near Pekin and dropped it in a well.

On April 2, 1981, the grand jury of Tazewell County handed up a

five-count indictment charging defendant with murder. The names of the witnesses endorsed on the instrument as being those who testified before the grand jury are essentially the same as those indicated by the officer at the time of hearing on the arrest warrant: Payne, who had assisted in the disposal of the body of Butler; Payne's woman companion, who had seen defendant and Payne near the cesspool on the farm where she and Payne had been living; Jack and Betty Russell to whom defendant had admitted the killing.

It is thus apparent that at the time of the original indictment neither the State's Attorney, nor any of the witnesses, knew with precision where the homicide had taken place; all that was known was that Butler's body had been discovered in Tazewell County, the autopsy revealed that death had been caused by a gunshot wound, and that defendant had admitted the offense. There is no indication in the record that the State's Attorney knew on April 2, 1981, that the offense had been committed anywhere other than Tazewell County. The informant's testimony did not come until September 1981. It therefore follows that the Tazewell County grand jury was fully authorized to proceed as it did in April.

In *People v. Polk* (1961), 21 Ill. 2d 594, 597-98, 174 N.E.2d 393, 395, the supreme court said:

"Neither the Illinois constitution nor the legislature has attempted to define the powers of the grand jury. It has its origin in the common law and has existed for many hundreds of years. Its construction, organization, jurisdiction and method of proceeding were all well known features of the common law before the organization of the State of Illinois and have been recognized and adopted in all our constitutions and in legislation as it existed at the organization of the State. [Citation.] While the grand jury is a necessary constituent part of a court having general criminal jurisdiction [citation], its powers are not dependent upon the court but are original and complete. Its duty is to diligently inquire into all offenses which shall come to its knowledge whether from the court, the State's Attorney, its own members, or from any source, and it may make presentments of its own knowledge without any instruction or authority from the court. [Citation.]

Although we have stated a court cannot limit the scope of the grand jury's investigation [citation], it is equally true that a grand jury has no right or jurisdiction to conduct an investigation into the personal affairs of citizens when there is no charge of a criminal offense involved, or where it otherwise

lacks jurisdiction of the subject matter. [Citations.]"

Upon the discovery of a homicidal death with the *corpus delicti* located in Tazewell County, the grand jury of Tazewell County obviously had "jurisdiction" within the meaning of *Polk*. It would have been derelict in its duty to ignore the situation.

Since *Polk* was decided prior to the Constitution of 1970 and prior to the effective date of the Code of Criminal Procedure of 1963, we believe that the concept of jurisdiction no longer applies to a grand jury. *Polk* proceeded on common law principles. Article I, section 7, of the Illinois Constitution of 1970 provides in part: "The General Assembly by law may abolish the grand jury or further limit its use." It follows that the grand jury is now a creature of statute.

The prior statutes under which *Polk* was decided (Ill. Rev. Stat. 1959, ch. 38, pars. 711 through 721; ch. 78, pars. 16 through 19) were extremely attenuated and did little, if anything, to alter the common law concepts of a grand jury and its authority and powers. Section 112—4(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 112—4(a)) undertakes to define specifically the duties of the grand jury. More significantly, section 114—1(a)(5) of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 114—1(a)(5)) providing for a motion to dismiss the charge, formerly a motion to quash the indictment, provides as a ground therefor that the grand jury acted contrary to article 112 of the Code and that substantial injustice resulted to the defendant. Further, in section 114—1(a)(7) (Ill. Rev. Stat. 1979, ch. 38, par. 114—1(a)(7)), another basis for dismissal is that the county is an improper place of trial. The further provision of section 114—1(f) (Ill. Rev. Stat. 1979, ch. 38, par. 114—1(f)) is that in lieu of dismissal on account of an improper place of trial, the court may transfer the cause to the proper venue.

■ The result of this constitutional and statutory scheme is that actions of a grand jury may amount to a statutory violation, but they are now removed from any concept of jurisdiction, that is, the power to act; and the violation may be rectified by the trial court. Under the facts of the instant case, the problem is one of venue only.

■ We will not be understood as holding that the powers of a grand jury are Statewide. On the contrary, section 112—4(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 112—4(a)) provides that the grand jury shall hear only evidence presented by the State's Attorney. Section 5(1) of "An Act in regard to attorneys general and state's attorneys" (Ill. Rev. Stat. 1979, ch. 14, par. 5(1)) limits a State's Attorney to commencement and prosecution of indictments in which the people of his county may be concerned. In

*People v. Sears* (1971), 49 Ill. 2d 14, 273 N.E.2d 380, the supreme court held that presentments to a grand jury should ordinarily come through the State's Attorney. Although importuned on several occasions by successive Attorneys General, the General Assembly has consistently declined to create a Statewide grand jury system under its undoubted power to do so.

■■ ■ We concur in the general statement found in 38 Am. Jur. 2d *Grand Jury* sec. 28, at 974 (1968): "Generally, a grand jury has no power to investigate transactions or acts occurring *wholly outside its county,* not connected with law violations in its county or triable therein." (Emphasis added.) Contrariwise, if evidence comes to the attention of the State's Attorney and from him to the grand jury that an offense may have been committed within the county, it is their duty to proceed. If, as is apparent in the instant case, further investigation discloses that the origin of the offense was in another county, it is their duty so to indicate and allow the defendant to proceed under section 114—1 of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 114—1), if he so desires.

The circuit court of Tazewell County was correct in transferring the cause to Mason County and we find no abuse of discretion in the circuit court of Mason County in denying the motion to dismiss. Grand jury proceedings in Mason County were not necessary and would constitute a waste of judicial and prosecutorial time and effort as being duplicitous of what had already occurred in Tazewell County. This is the rationale of section 114—1(f) of the Code.

■ Defendant's second issue concerns the refusal of the trial court to suppress statements made to a government informer. We have already alluded to this situation, but a fuller exposition is required to understand the problem. Defendant was taken into custody by the authorities of Reno, Nevada, on March 31, 1981. He was advised of his *Miranda* rights and placed in a cell in the city jail which was also occupied by George Shaw, who was serving a sentence for forgery. Shaw was being held there in lieu of the State penitentiary for his own safety since he had previously testified against several persons who were being held in the penitentiary. At the hearing on the motion to suppress, Officer Eubanks of the Reno police testified as follows:

> "I told Mr. Shaw that a man was being placed up in his cell, which is felony hold cell, in the Reno City Police Department for murder on an out-of-state warrant and that it was over some type of cocaine deal and I asked him if mind if he would pay attention to anything the man might say regarding what

had happened and Mr. Shaw agreed and then I reminded Mr. Shaw under what manner he might conduct himself as far as anything that Mr. Gibson might say and then—

PROSECUTOR: In what manner specifically did you remind Mr. Shaw of that?

EUBANKS: That he may not ask any direct questions, that he may not instigate any conversation regarding any criminal activity or anything that he was under arrest for. If the man talked to him or admitted or related or volunteered any information that he may talk back to the man in response to that in normal conversation manner, but he may not interrogate the man or perform an actual interview or actually seek or elicit any information from the man."

According to Eubanks, Shaw did not receive any compensation for his cooperation. Shaw himself also stated that he received no compensation, but he did state that he received a "per diem" for coming to Illinois to testify; his further testimony makes clear that this was a ration allowance and plane fare.

During conversations between defendant and Shaw in the Reno city cell, defendant told Shaw that he was wanted for murder in Illinois and that he had killed a person named Butler; he further stated that he had killed Butler by shooting him through the heart with a .357 magnum and that the incident had occurred in a State forest about four miles from his home. Defendant also told Shaw that after the killing he took the body to a farm near Pekin and dropped it in a well with the assistance of another person. Sometime during the afternoon of March 31 defendant talked with Illinois authorities and afterwards told Shaw that it was all over and that "they had him."

The trial court denied the motion to suppress Shaw's testimony and it was presented to the jury at trial in essentially the same form as recited above.

We find the instant case to be virtually indistinguishable from *United States v. Henry* (1980), 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183. There the Supreme Court held that the statements to the informer were obtained in violation of the defendant's right to counsel and were thus inadmissible. The court emphasized that the informer was a paid agent acting under government instructions and was also a convicted felon in the guise of a fellow prisoner. The informant's failure to disclose his true identity and the defendant's confinement increased the likelihood of an incriminating statement on the part of the defendant. The court also noted that one has a powerful psychiatric incentive to reach for aid while in confinement and that confine-

ment "may bring into play subtle influences that will make [a defendant] particularly susceptible to ploys of undercover Government agents." 447 U.S. 264, 274, 65 L. Ed. 2d 115, 124, 100 S. Ct. 2183, 2188.

In both *Henry* and the case at bar, a government informant, who was also a convicted felon, shared a jail cell with defendant. In both cases the identity of the informant was unknown to defendant. The informant apparently gained the confidence of defendant and elicited incriminating statements from him. In *Henry*, there was evidence that the informant received monetary compensation for his services, while in the present case, the informant had been compensated for his services as an informer in the past and admitted that he was not testifying against defendant "out of the goodness of [his] heart," or because he wanted to see justice done. In fact, the conduct of the State in the instant case is perhaps even more reproachable than that of the FBI agents in *Henry*, for here the defendant was deliberately placed in the informant's cell and the informant asked questions of the defendant to clarify his statements concerning the victim's death, while there is no indication that similar conduct took place during the *Henry* defendant's incarceration.

The admission of Shaw's testimony was therefore clear error, but in view of other testimony in the case, it was only cumulative, and the error was then harmless. *Chapman v. California* 91967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

A few highlights from the other testimony will demonstrate the cumulative nature of Shaw's testimony. Bow Payne testified that after he had assisted defendant in placing the body in the well, defendant stated to him, "Now you are an accessory to murder." Payne's further testimony was that after they had dumped the body and were driving back to Pekin, defendant took a revolver from behind the seat of the vehicle, emptied the shells, and threw them out of the window; there was only one empty casing; none of the other shells had been fired. At least three other witnesses testified as to defendant's explicit and implicit statements that he had killed Butler. The evidence, taken together, overwhelmingly establishes defendant's guilt beyond a reasonable doubt without Shaw's testimony. Its admission was then harmless beyond a reasonable doubt.

Defendant next complains of three instances of prosecutorial misconduct. We have examined the record with care and find no validity to the objections. None of them has been preserved in defendant's post-trial motion and they are therefore waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Furthermore, the evidence

in the case was not closely balanced, so the objections cannot be considered plain error. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.

Defendant's final complaint is that the trial court overruled his objection and admitted evidence that at a time after the killing defendant waved a .357-caliber gun in the face of a witness and said, "I could blow you away now." He maintains that this evidence was irrelevant and served only to prejudice him in the eyes of the jury.

■■ The trial court has a great deal of discretion on the matter of relevancy and its decision will be disturbed only upon a showing of abuse of that discretion. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) The evidence here was clearly relevant since it established that defendant possessed a .357-caliber gun and the autopsy report showed that Butler may have been killed with such a weapon. The only potential problem with this evidence arises from the fact that the verbal threat portion thereof may also constitute evidence of another crime. Such evidence is inadmissible if utilized solely to demonstrate a defendant's propensity to commit a crime. This type of evidence is, however, admissible if it sheds light upon a defendant's intentions, family relationships, or the chain of circumstances surrounding the offense with which defendant is charged. (*People v. Glidewell* (1979), 78 Ill. App. 3d 734, 737-38, 397 N.E.2d 544, 546-47.) Therefore, this evidence, including the verbal threat, was relevant in that it tended to establish defendant's reckless (as opposed to criminal) character, and described conduct which occurred in close proximity to the date of Butler's murder.

For all the foregoing reasons, the judgment of the circuit court of Mason County is affirmed.

Affirmed.

GREEN, P. J., and MILLS, J., concur.